# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 478 | DATE | 12/23/2004 |
| CASE TITLE | QING LIU vs. UNITED STATES OF AMERICA | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Judgment is entered in favor of plaintiff, Qing Liu and against the defendant, United States of America, in the amount of $450,000.00.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 27 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | rbf | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Qing Liu,

    Plaintiff,

v.

United States of America,

    Defendant.

03 cv 478

Judge Ronald A. Guzman

DOCKETED
DEC 27 2004

## MEMORANDUM OPINION AND ORDER

This case involves a complaint for damages resulting from an automobile accident in which the plaintiff's automobile was struck from the rear by a vehicle being driven by a United States Postal Service worker. Liability is conceded by the government and only the issue of damages is contested. The case was tried to the bench over a period of three days during which the plaintiff, her husband, her two treating physicians, Drs. Noam Stadlin and Charles Wang, and defendant's expert, Dr. Richard Penn, testified. The court compliments the attorneys for their presentation and examination of both the fact and expert testimony in this case.

The plaintiff, Qing Liu Tabiadon, was born in China on May 16, 1957 where she was a

1



teacher. She moved to America in 1992 and finished her master's degree in education in 1997. She testified that before the accident, which occurred on Sept. 28, 2000, she felt generally well. She had no trouble with her neck, with the exception of occasions when she worked for long periods of time on her computer. The last time she saw a doctor or obtained any treatment for her neck pain before the accident was in April of 1997. So, for approximately 3 ½ years before the accident her symptoms, if any, were not sufficient to cause her to seek any medical attention. Plaintiff's husband, Brian Tabiadon, also testified that for two and one half years prior to the accident plaintiff had no physical difficulties.

On Sept. 28, 2000 at approximately 10:30 AM plaintiff was driving her car, a 1990 Geo Metro, west on Galena Boulevard near the intersection with Highland Avenue in the City of Aurora, Illinois at approximately 30 mph went she was rear ended by the defendant's vehicle. The resulting impact was sufficient to shatter plaintiff's rearend window and propel her car forward 100 to 200 feet. She testified that she felt a big impact from behind like a big explosion which caused her back to hit the back of the seat. Her body was thrown back and forth several times as a result of the impact. After the accident, she told the defendant and the police that she was all right and she drove home.

The next day she did not feel well. She felt dizziness and back pain, nevertheless, she attended a prearranged appointment in the DuPage County Building where she was married before a County Judge. Immediately after the marriage ceremony she went to a hospital

emergency room. At that time, she was feeling pain in her chest, back, neck, the back of her head, her shoulder and right arm. At the hospital they took x-rays and sent her home with pain medication and a reference to Dr. Ali Mohiuddin for follow-up care. Sometime after the visit to the emergency room, plaintiff realized that a crown in her tooth was missing. The tooth was broken. On Oct. 13 and 14 she went to her dentist to have the crown replaced. On Oct. 14, 2000 she also saw Dr. Mohiuddin. She told him that her head and neck hurt and that she had some numbness and tingling in her fingers. He prescribed a muscle relaxer and pain pills. For the next two days she attempted to continue her computer web designing work at home, but was unsuccessful in doing so because of her condition.

On Nov. 6, 2000 she had an MRI done at St. Edwards hospital. The pain was progressing. By January 5, 2001 she was feeling weakness in her hands and having difficulty holding onto objects. This had never before happened to her. The results of an EMG examination done by Dr. Elton Dixon on January 5, 2001 are consistent with a C5-C6 right radiculopathy and left C5-C6 root irritation. Dr. Dixon also reported that the findings were consistent with both chronic and acute process, and that they could be related to the recent motor vehicle accident of September 2000. On the advice of her doctors, she undertook physical therapy for a period of approximately three months, but did not obtain much relief. At times she felt a hot stinging sensation in her arms, legs and feet. She began to have difficulty closing her fingers completely.

On April 25, 2001, she went to see Dr. Daniel J. Harrison complaining of neck pain, pain

going into the back of her head, the top of her head, down her right arm and hand with numbness as well as eye pain. She also complained of having pain in her right arm and right leg when she walked. Dr. Harrison found weakness in her right triceps, right grip strength and possibly in her right hip flexers as well as diminished deep tendon reflexes. At Dr. Harrison's suggestion the plaintiff had a second MRI examination on May 4,2001.. After this MRI, Dr. Harrison told her she needed surgery.

On May 19, 2001 Plaintiff attended her own wedding celebration/reception in California. Videotapes of the celebration show her moving easily and seemingly without pain. She is seen doing such things as dancing, walking down steps, tilting her face and head up down and to the side and apparently looking over her shoulder. The tape also shows her performing functions requiring fine motor skill, such as opening presents, without any apparent problems. She bends over, kneels down, walks, turns and moves in what appear to be normal easy movements. She does not appear in pain, stiff or hesitant in her movements. When she looks quickly to the side or down towards her feet she does so naturally and without hesitation. Yet on May 31, 2000, when she sees Dr. Leonard Cerullo, she complains of pain in her neck, right arm with numbness, hand, tingling in her right leg, slight left arm and leg symptoms, and weakness in her right thumb.

Finally, on July 31 2001, Dr. Noam Stadlan performs surgery on plaintiff's neck. The surgery took three to four hours and she was hospitalized for three to four days. Thereafter, she

wore a neck collar for three to six months; initially 24 hours a day. Today she sometimes wears a soft collar when she feels it is necessary to relieve the strain on her neck. She has a permanent scar on the left side of her neck from the operation which bothers her mentally. She was also prescribed medication for inflamation and pain which made her very sleepy.

Although the operation provided some pain relief, she is still dealing with different pains and loss of strength in her arms. She claims she cannot teach full-time and when she comes home she goes to sleep right away. She still suffers today from pain in the back of her head, neck and arm. The pain limits her ability to do household chores which require bending down such as cleaning the floor, chores which require reaching up, such as putting things in the cabinets, and vacuuming which requires pushing and pulling. She is able to drive but finds it difficult because she has difficulty twisting her head to the side as she used to do before the accident. She has difficulty putting on long dresses and washing and drying her hair. Before the accident, she enjoyed jogging, swimming, tennis and weight training. She no longer jogs, swims or plays tennis. She also has been forced to give up weight lifting. She does still walk. Plaintiff also complains of having much less energy now than she had before the accident.

Plaintiff's husband corroborated the fact that from the time of the accident until the time of her surgery her condition deteriorated. The pain in her neck and arms increased and her weakness and loss of motor skills increased to the point where she was dropping objects. After the surgery, she spent the first two or three weeks at home mostly sleeping. She was unable to cook, clean or

do any of the things she normally did around the house. Today he lists the following changes and limitations that were not present before the accident: (1) Her ability to do chores around the house and on the weekends is much more limited. She cannot do any kind of heavy work or lifting. (2) She is unable to do things that require bending or scrubbing such as washing floors. (3) He must accompany her when she goes shopping so he can carry the packages. (4) Although she can drive, she has great anxiety about driving and prefers that he drive. Further, her ability to drive is diminished because she has limited ability to turn her head from side to side. She must turn her whole body in order to see to the side. (5) Her energy level is much reduced. She used to be efficient at doing several different tasks at once and keeping track of each successfully. She cannot do that now. If she over exerts herself now she pays for it for the next day with neck pain. (6) On the weekends before the accident they would often spend most of an entire day bicycling around the Fox River area stopping at different places and towns to shop etc. Now, she can no longer do that and her ability to accompany him on the bicycle is much more limited. If she exerts herself too much, her neck stiffens up and gives her pain. (8) She no longer enjoys swimming. She tried swimming once or twice but it aggravated her neck and shoulders. His wife currently takes Tylenol, aspirin and Excedrin for pain.

On cross-examination Mr. Tabiadon admited that the plaintiff is able to care for herself and do some house work, including cooking, occasionally. At the present time she is not seeing a doctor or receiving any treatment.

6

Dr. Noam Stadlan, the neurosurgeon with the Chicago Institute of a Neurosurgery and Neuro-research who operated on the plaintiff, also testified. Dr. Stadlan testified as to his excellent credentials, education and training. He has been board certified since June 2000. The doctor sees approximately thirty to sixty patients per week ,operates two to seven times per week, and ninety-five percent of his surgical procedures involve the spine. He first saw the plaintiff on June 11, 2001. His interpretation of the results of the MRI examination of November 6, 2000 is that the plaintiff had three bulging or herniated disks. He saw a mild degeneration as reflected by the darkened color which is indicative of loss of water in three of the disks, but he saw no significant shrinkage of the disks. He found no significant bone spurring or degeneration. Doctor Stadlan's notes indicate his examination revealed multi-level cervical stenosis as well as degenerative disease from C3 down through C6 which was worse at C 4-5 and C 5-6. At tria,l he characterized the degeneration as mild and not significant. It was not so characterized in his notes.

Dr. Stadlan's interpretation of the results of the MRI examination of May 4, 2001 is that they are very similar to the results from the November 6, 2000 MRI. He sees no significant changes. This, would tend to indicate that there was no rapid degeneration occurring. Although the report of Dr. Ali M. Mohiuddin of May 7, 2001 indicates that the degree of spinal stenosis at the most significant level, C4-5, appears slightly worse than on the prior study of November 6, 2000, in Dr. Stadlan's opinion the MRI pictures show that disc herniation impinging on the spinal cord is the cause of plaintiff's problems and not bone spurs impinging on the nerve root. Further, in his opinion, based upon the patient's history and examination, plaintiff's disc

7

herniation was caused by trauma not by degenerative disc disease. According to Dr. Stadlan the EMG examination done by Dr. Elton Dixon on January 5, 2001 is consistent with some irritation of the nerves, but not particularly significant or useful. In Dr. Stadlan's opinion, the plaintiff's complaint of neck pain in April of 1997 at the University of Illinois clinic is of no significance with regards to her present condition. In his opinion that complaint is indicative of normal muscle pain, not any problem with her spine.

By all accounts, including doctors Penn, Stadlan and Wang, Dr. Stadlan's operation was a success. The pressure on the spinal cord from the three herniated discs was relieved and the fusion of the three vertebrae was successful. In her first visit after the operation on Sept. 13, 2001, Dr. Stadlan reports that the plaintiff is doing well. Her range of motion is good. She still has some numbness in the hands, but it is much better. Her strength is better and she is quite pleased with the results. On October 11, 2001, the plaintiff was seen and complained of numbness in the arms, but overall improving week to-week and month by month. On January 17, 2002, the plaintiff reports to Dr. Stadlan that her neck is doing fine. Her hands are significantly better. She still reports a little bit of numbness but much better than previously. For the first time, however, she complains to Dr. Stadlan of thoracic pain and pain in her breasts. She does not complain of any specific numbness or lower extremity problems. On June 10, 2002, the plaintiff complains to Dr. Stadlan of possible new left-sided weakness. She is still having some neck pain. On Aug. 14, 2003, the plaintiff complains to Dr. Stadlan of some left-sided problems and thoracic pain. The pain was worse before and now is mostly numbness across the shoulders towards the left chest. While her previous problems were on the right side she is now

having problems on the left, her entire left side. The examination showed continued hyperreflexia, but good coordination. In a September 2003 office visit, the plaintiff continued to complain of chest pain and leg symptoms. No new problems.

In Dr. Stadlan's opinion, the numbness and neck pain were consistent with her recovery and prior condition, but the new weakness on her left side and thoracic pain were not consistent with her condition and he could find no specific cause for any of these new symptoms. The finding in his post-operation neurological examinations of continued hyperreflexia indicates spinal malfunction. From all of the above, Dr. Stadlan's opinion is that the cause of the plaintiff's continued numbness and neck pain is spinal cord damage caused by the prior impingement of three disks upon the spinal cord. Dr. Stadlan opines that even after the impingement was relieved by the operation, the spinal cord has not completely healed and probably, given that this condition remains a year after the operation, never will completely heal.

Also testifying was Dr. Charles Wang, board certified in neurology and neurophysiology, to whom the plaintiff was referred after the surgery performed by Dr. Stadlan. Dr. Wang first saw the plaintiff on Sept. 15, 2003. On this occasion, Dr. Wang reports that although some of the plaintiff's symptoms disappeared after surgery, a few months later she reported numbness and tingling in the left shoulder and pain in the left neck and occipital areas, breast pain and lower rib cage pain. She also reported some coordination problems while walking, spasm in the right leg and pain in the left neck and postauricle area. Dr. Wang found decreased muscle strength on the

right upper and lower extremities and increased tone in the right upper and lower extremities. He also found decreased sensation to pinprick on the left upper extremities (Brown-Sequard syndrome). Dr. Wang found hyperreflexia in the right upper and lower extremities which may indicate injury to spinal cord or brain. He found Hoffman signs which may indicate lesions of the brain or spinal cord. Dr. Wang listed three possible causes of these symptoms: (1) residual damage to spinal cord, spinal cord disease, (2) complex regional pain syndrome, or (3) brain disease. A brain scan after the operation was negative. After examining the plaintiff again on October 20, 2003, Dr. Wang testified that some of her complaints were difficult to explain from a spinal cord injury. Dr. Wang testified that the pain to the back of her head was related to cervical trauma, but he did not believe the pain on the left side of her face was related to spinal cord problems. In subsequent examinations, Dr. Wang noted some improvement of facial pain and numbness, but also new complaints of throat, stomach and back pain and swallowing problems.

Dr. Wang concluded that the patient suffered from an injury to her spinal cord. Because none of these symptoms were present before the traffic accident, he concluded that the likely cause of the injury was the motor vehicle accident she was involved in prior to the operation. The accident, he believes, caused a herniated disc which pressed upon the spinal cord and possibly on nerve roots. Dr. Wang opined that the plaintiff has permanent weakness and loss of coordination in her right hand. The use of this hand is compromised. Activities not requiring extensive use of the hands, such as teaching should cause her no problem, but activities requiring a high degree of hand coordination and use, such as piano playing, she will not be able to do.

On cross-examination, Dr. Wang admitted that the plaintiff did have a prior history of upper shoulder and back pain and that some of her current symptoms are bizarre. He agrees that if the plaintiff's symptoms are caused by the formation of bone spurs due to degenerative disc disease, this would take years to develop. Plaintiff's breast and thoracic pain complaints are not related to any spinal condition. He does not feel that she has complex regional pain, rather that she has damage to the spinal cord and likely to nerve roots as well. This also would account for her headache pain. In spite of the spinal cord decompression, which was successful, she retains permanent spinal cord injury.

Dr. Richard Penn testified for the defense. Dr. Penn also testified as to his excellent credentials. Among other things he is a consultant for two Food and Drug Administration advisory panels. He has been board certified in neurosurgery since 1976. He is the editor of the Neurosurgery Journal and has published and done surgery with regard to movement disorders and specifically related to spinal injury. His current practice is in pain and movement disorders. He is a full professor at the University of Chicago Medical School. In reaching his opinion he reviewed all of the depositions, hospital records, office, x-rays, the pre- and post-operation MRI's and the opinions of the treating physicians.

Dr. Penn's opinion differs from those of Drs. Wang and Stadlan. He believes that the stenosis of the plaintiff's spinal cord is arthritic in nature and is caused by degenerative wear and tear as opposed to the acute trauma resulting from the car accident. In support of his opinion,

11

Dr. Penn points out that the plaintiff complained of neck and upper back pain before the accident. In September 1995, the plaintiff visited the University of Illinois at Chicago Medical Clinic and complained of having upper back pain for the last year. Again in April1997, she complained of neck and upper shoulder pain especially when working on long computer programs which necessitate sitting for four to six hours. She indicated that she had to do most of her reading lying on her bed or in positions other than sitting. Dr. Penn disagrees with the conclusion reached by the examining physician at the University of Illinois at Chicago Medical Clinic, which was, "muscular strain to back and shoulders, probably secondary to posturing."

In Dr. Penn's opinion the examination and x-rays taken after the accident showed some degenerative changes in her spine. Specifically, Dr. Penn believes Joint Exhibit 3A shows bone spurs around nerve root openings and also the narrowing of disks in plaintiff's neck. Such changes take place over time and are not the immediate result of an accident. Based upon the plaintiff's ability to drive home after the accident and the emergency room report of the next day, he feels that there was no acute herniation, that is a sudden push of the disk past the ligament and into the spinal cord, as a result of the accident. He does agree that the accident might have aggravated the plaintiff's previously existing neck condition.

Doctor Penn also perceives a significant difference in the MRI pictures taken on Nov. 6, 2000 and those taken on May 4, 2001. In his opinion, the second set of MRI pictures show the stenosis is progressing. This would tend to support a conclusion that the changes taking place

12

were due to a degenerative process over a period of time, rather than a single, acute trauma. In this regard, Dr. Penn differs with Dr. Stadlan, who found no significant change in the condition between the two MRI examinations. Dr. Penn sees no indication of spinal cord damage or of any lesions to the spinal cord in any of the MRI's taken either before or after the operation. Dr. Penn also disagrees with doctors Wang and Stadlan as to the post-operative existence of hyperreflexia, which would be an indication of spinal cord damage. Dr. Penn relies upon the EMG examination done after the operation, which he says negates the existence of hyperreflexia. Dr. Stadlan found no hyperreflexia in his examination immediately after the operation, but did find it present in his subsequent two examinations. Hoffman signs were found after surgery as well as before the surgery. Dr. Wang also found hyperreflexia after the operation.

In addition, Dr. Penn finds support for his opinion in the videotape of plaintiff's wedding celebration which took place on May 19, 2001, several months after the accident. The video shows the plaintiff walking downstairs, lifting her dress and looking down towards her feet to do so, turning her head to the right and left, dancing with extensions of her arm and neck, using her hands to perform fine motor skills, and much movement of her head and neck, all without visible strain or even hesitation. Dr. Penn explains the plaintiff's lack of symptoms in the videotape by explaining that in one-third of the MRI scans showing impingement similar to the plaintiff's, the patient will have no real symptoms. Thus, the plaintiff could easily have had the three bulging disks and even a herniation impinging upon the spinal canal as shown in her MRI and yet be without symptoms. In Dr. Penn's opinion, because of the degenerative nature of her condition, plaintiff likely would have needed surgery in two or three years even without the

13

accident. Most of her post-surgery symptoms cannot be related to her cervical condition and she has very little permanency. She has a very slight loss of motion such that she would hardly notice it. In essence, Dr. Penn is of the opinion that the plaintiff certainly suffered from pain as a result of the accident and that the accident added somewhat to her already occurring degenerative process, but that she would likely have needed surgery within two to three years even without the accident and that her post-accident symptoms were not caused by any trauma inflicted by the accident.

Thus, we are left with two very different opinions based upon essentially the same medical and historical data. Doctors Stadlan and Wang find that the disc herniation was caused by the traumatic events of the accident and that the plaintiff has permanent spinal cord damage. Dr. Penn finds that although the accident may have added minimally to the degenerative process, the plaintiff would have needed surgery within two to three years even without the accident, and, further, that she suffers no permanent injury to her spinal cord as a result of the disc impingement, regardless of its cause. Plaintiff seeks damages in the range of $700,000.00 while defendant urges support to find damages of approximately $200,000.00 or less. Liability, of course, has been stipulated. The Court finds that the acute trauma resulting from the accident caused the herniation of the discs which necessitated the radical surgical intervention that plaintiff was forced to undergo. Our finding is based upon our belief that Drs. Wang and Stadlan are correct in their opinions that the powerful impact resulting from the accident was the cause of the disc herniation. Their reasoning better conforms to the plaintiff's history then does that of Dr. Penn. Although there is some slight history of neck problems before the accident, the only

14

medical diagnosis on record as to those problems is a diagnosis of muscular strain to the neck and shoulders. Nor, do we believe that Dr. Penn is on sound footing in estimating that the plaintiff would have required surgery in three years even without the accident. This, it seems to us, is merely a guess. Indeed in commenting upon a contrary opinion - that plaintiff would likely not have needed such surgery absent the accident - Dr. Penn wonders how one could come to such a conclusion without a crystal ball. That is not to say that the doctor was not thorough in his examination of all of the data or honest in his opinion. However, his readings of the MRIs, EMGs and results of the physical examinations done by other physicians are contradicted by two treating physicians in this case. Further, he himself testified that a large number of patients with MRI findings similar to those of the plaintiff in this case will have no symptoms whatsoever. In addition, as we have previously stated, the symptoms prior to the accident were slight and deemed not to be related to any spinal problem. Finally, we must take into account the sequence of events. Prior to the accident, plaintiff's back and neck problems were slight. A relatively short time after the accident her problems are such that she is willing to risk major surgery which will permanently alter her anatomy and with no guarantee of success. While it is possible that the accident just happened to coincide in time with the onset of severe symptoms from plaintiff's already existing condition, it is not likely. Rather, we find that it is more likely true than not that the accident caused the condition, in this case the herniation of the disks, which resulted in the symptoms that necessitated the medical intervention.

This leaves us yet to deal with the issue of the plaintiff's current condition and the question of permanency. In this regard, we find that many of the symptoms, problems and

15

conditions the plaintiff complains of today lack any medical connection to the injuries she received as a result of the accident. Drs. Wang, Stadlan and Penn all agreed that, to varying degrees, some of plaintiff's present symptoms cannot be ascribed to her cervical condition. All of the doctors have indicated an inability to relate some of her symptoms to the disc herniation. Dr. Wang even called some of her symptoms "bizarre." Further, I find no convincing evidence that plaintiff is or will be prevented from engaging in her profession as a teacher by her condition. However, I find that the continued existence of hyperreflexia even after a successful operation is indicative of some amount of permanent damage to the spine. How much is difficult to tell because, unfortunately, the plaintiff's many non-related post-operative complaints serve to camouflage her true condition, or at least what her true condition is it is related to the injuries caused by the car accident. In addition, the videotape of her wedding reception activities casts some doubt as to the extent of her impairment. Nevertheless, as of result of this accident, in which the plaintiff had no fault whatsoever, she has been forced to undergo an extremely serious and risky operation, and endure a great deal of pain, suffering and the mental anguish that comes with serious concern over a long period of time about her future physical condition, a concern, which in our opinion, the record shows has taken a heavy toll upon this particular plaintiff. After a long period of postoperative recuperation, she now faces the rest of her life with some permanent spinal damage. Based upon the totality of the evidence, the Court finds damages for past and future pain, suffering, and permanent loss of function in the amount of $450,000.00.

Judgement is entered in favor of plaintiff and against the defendant in the amount of $450,000.00.

SO ORDERED    ENTER:    12/23/04

*Ronald A. Guzman* (signature)
RONALD A. GUZMÁN
**District Judge**